# Illinois Official Reports

## Appellate Court

*People v. Moore*, 2018 IL App (2d) 170120

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. QUENTIN CORLEY MOORE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-17-0120 |
| Filed | June 21, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 05-CF-2900; the Hon. Susan Clancy Boles and the Hon. M. Karen Simpson, Judges, presiding. |
| Judgment | Vacated and remanded with directions. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, David J. Robinson, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices McLaren and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1    In 2007, defendant, Quentin Corley Moore, was convicted of attempted first degree murder. We affirmed his conviction on direct appeal. *People v. Moore*, No. 2-08-0919 (2010) (unpublished order under Illinois Supreme Court Rule 23). Subsequently, defendant filed a *pro se* postconviction petition. Counsel was appointed to represent defendant on the petition but was later permitted to withdraw. The court subsequently dismissed the petition on the State's motion. Defendant appeals, challenging the orders granting counsel leave to withdraw and dismissing the petition. We hold that postconviction counsel failed to demonstrate compliance with the mandate of Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) that counsel "ascertain [the defendant's] contentions of deprivation of constitutional rights." We therefore vacate the orders allowing withdrawal of counsel and dismissing the petition, and we remand for further proceedings.

## I. BACKGROUND

¶ 2

¶ 3    In December 2005, defendant was indicted on two counts related to an alleged shooting in Aurora on November 22, 2005. Count I charged defendant with attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2004)) and alleged that defendant "performed a substantial step towards the commission of [first degree murder], in that he without lawful justification and with the intent to kill Julian Ramos, shot Julian Ramos with a firearm." Count II charged defendant with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2004)) and alleged that defendant "discharged a firearm in the direction of another person in that he shot at Julian Ramos with a firearm."

¶ 4    Prior to jury selection, the State moved to amend count I to allege that defendant "shot *at* Julian Ramos" (emphasis added) instead of "shot Julian Ramos." Defendant did not object, and the trial court permitted the amendment.

¶ 5    In its opening statement, the State anticipated that the evidence would show that, on November 22, 2005, defendant was driving a car with three fellow members of the Latin Kings gang. One of the passengers was Blake Pannell, an informant with the Federal Bureau of Investigation (FBI). During the drive, another passenger, Augustin Montes, saw a pedestrian he recognized as Ramos. Montes, armed with a handgun, left the car and shot at Ramos.

¶ 6    The evidence at trial was recounted in detail in our disposition on direct appeal. See *Moore*, No. 2-08-0919. Pannell testified that, in November 2005, he was a member of the Latin Kings, working as an informant for the FBI. On November 22, 2005, Pannell was riding around Aurora with three fellow Latin Kings: defendant, Montes, and Ruben Hernandez. Defendant was driving. The four were looking for graffiti that was insulting to the Latin Kings. When they saw such graffiti, they would spray paint over it with insults to the Insane Deuces, a rival gang. For security purposes, they had a gun, which belonged to defendant. Shortly after joining his associates that day, Pannell activated the secret audio-recording device that he was wearing.

¶ 7    Pannell testified that, at some point during their drive, Montes remarked that he observed a pedestrian who belonged to the Insane Deuces. The four plotted how to shoot the pedestrian. Defendant drove the car in pursuit of the intended target. Montes twice exited the car with the gun in order to shoot the pedestrian. The first time Montes exited, Pannell also left the car and spray painted over some nearby graffiti. Before Montes exited the second time, Pannell

covertly removed the clip from the gun, which left Montes with just the one bullet in the chamber. Pannell witnessed Montes fire the one bullet at the pedestrian. The four then drove in further pursuit of the pedestrian but relented when he reached an area with a number of bystanders.

¶ 8    Pannell testified that he observed the pedestrian while the group was pursuing him. However, only in the following exchange did Pannell name the pedestrian:

"Q. Were you ever going to give the clip to [Montes]—for him to complete the shooting of Julian Ramos?

A. No."

¶ 9    Pannell testified that, after the encounter with the pedestrian, he and his three associates went to the home of Marina Moreno, an aspiring Latin Queen. Montes hid defendant's gun in Moreno's bedroom ceiling.

¶ 10    The State played for the jury a copy of Pannell's audio recording. Voices are heard declaring an intent to shoot someone and then commenting on the subject as he is pursued and flees. Mixed in with the statements are the sounds of a car door shutting. The State also introduced into evidence a transcript of the audio recording. Ramos is not identified by name in the recording itself or in the transcript.

¶ 11    Moreno testified that, on November 22, 2005, defendant came to her house with Pannell, Hernandez, and Montes. After the group left, defendant phoned Moreno and told her that there was a gun in the ceiling in her room. About a week later, Moreno took the gun and delivered it to defendant at his request. She was not certain that the gun belonged to defendant, but she had seen him with it on prior occasions.

¶ 12    The State also called the FBI agent who worked with Pannell. The agent testified that Pannell contacted her on November 22, 2005, to report a shooting that had just occurred.

¶ 13    The State's final witness was an Aurora police officer who testified as an expert on gang activity. The expert explained that animosity between rival gangs can manifest itself in arguments, fights, or shootings. The expert opined that the shooting on November 22, 2005, was gang-related.

¶ 14    Following that expert's testimony, the State declared that it had no other witnesses. Ramos had not testified. The State moved to amend both counts of the indictment by substituting "another" for "Julian Ramos." Count I as amended would allege that defendant, "without lawful justification and with the intent to kill another, shot at another with a firearm." Count II as amended would allege that defendant "discharged a firearm in the direction of another person in that he shot at another with a firearm." The State explained that its reason for the proposed amendment was that it "couldn't find" Ramos, though it had subpoenaed him for prior settings of the trial. The State contended that the amendment would conform the indictment to the evidence at trial, which was that "an individual was shot at, a person was shot at by [Montes]." The State suggested that Ramos's name was "surplusage" in the indictment.

¶ 15    Defense counsel objected to the proposed amendment. The trial court asked how the amendment would prejudice the defense, and defense counsel replied that the amendment would permit the State to argue that defendant was guilty as long as there was someone in the area whom Montes could have shot at, whether it was Ramos or not. The court replied:

"I don't think that is what they [the State] are saying. I think that they are saying it is a person who[m] [Montes] saw and said he's a rival guy and that is the person. ***

- 3 -

I think they are identifying him in that way. I don't think they are saying it could be anybody. I mean, it is not like there were ten people there that were being shot at."

¶ 16 The court added that it would not permit the State to argue in closing that defendant would be guilty as long as Montes shot at some individual, even if it were not the individual whom Pannell testified he and his associates pursued. Finding no prejudice to the defense, the court allowed the amendment to both counts.

¶ 17 Subsequently, the State rested and the defense called one witness, an Aurora police detective. The detective testified that, when he spoke with Pannell on the evening of November 22, 2005, Pannell did not mention having done any spray painting or having exited the car near the time of the shooting. Nor did Pannell mention that the gun in the car belonged to defendant.

¶ 18 In its closing argument, the State did not mention Ramos by name but referred generically to the person who Pannell testified was pursued by his group on November 22, 2005.

¶ 19 In the defense's closing, counsel commented on Ramos's absence. In rebuttal, the State argued:

"Do we have to show that Julian Ramos—what do we have to show about Julian Ramos? Well, there is no evidence about Julian Ramos. We do have evidence, evidence from the day of the shooting that Augustin Montes chased after a guy that Blake Pannell identifies as a heavyset Hispanic kid. Identity is not an issue. If you look at the instructions, it says that. And what you will get is the instructions. And I in no way mean to misspeak. The definition of *** attempted first degree murder *** is that without lawful justification with the intent to kill an individual, [*sic*] does any act which constitutes a substantial step towards the killing of an individual."

¶ 20 At this, defense counsel objected, remarking that the State was "dangerously close to insinuating that *** this guy just vanished into thin air." Counsel noted that the State had "already named him as Julian Ramos." The State replied that its remarks about what it had to prove were simply in response to the defense's comment on Ramos's absence. The trial court instructed the State that it could "talk about the jury instructions and the individual." Continuing with its argument, the State commented:

"Again, it's an individual shooting another person. Don't have to identify that person. That person, in fact, does not have to come and testify. You won't see an instruction that says you must hear—"

¶ 21 Defense counsel again objected, and the court sustained the objection.

¶ 22 The jury returned verdicts of guilty on both counts. Defendant filed a posttrial motion, reasserting that the trial court erred in permitting the amendments that eliminated the name "Julian Ramos." The trial court denied the motion. The court then sentenced defendant to 23½ years in prison. The court merged count II into count I for purposes of sentencing.

¶ 23 On direct appeal, defendant raised no issue regarding the amendments to the indictment. We affirmed defendant's convictions. See *Moore*, No. 2-08-0919.

¶ 24 In October 2010, defendant filed a *pro se* postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). The petition was over 500 pages, including attachments. He raised numerous contentions of error. One paragraph of the petition read:

"Petitioner was denied his right to the effective assistance of appellate counsel where appellate counsel failed to raise me being prejudiced by these amending at the

- 4 -

day of trial and at the closing of trial [right] before closing arguments. On Nov. 5, [2007,] petitioner was prejudiced by the Court allowing the word be changed from 'shot' to 'shot at' on the first day of trial, which [the] judge agreed that this amending came as [a] surprise, also no motion by the State for this amending which is required by 725 ILCS 5/115. Nov. 7, [2007,] there was another amending that was allowed that the judge allowed of the name of [the] alleged victim to be removed and for count one to read, 'the intent to kill another,' and for count two to read, 'shot at another with a firearm,' which the State said the name is mere surplusage. No motion on file for this second amending and with his name being removed in the Criminal Procedure Book 5/114-1 says that in section 10, the misnomer results in substantial injustice to the defendant, nothing of 5/115-5 of the Criminal Procedure says the name could be removed and this done [right] before closing arguments of trial. He wasn't even there at trial and they even used his name in [opening] statements, during trial and closing arguments. Case [law] says that you can't broad[en] an element of the offense has to be returned to the Grand Jury for any changes. Then the judge makes a statement saying there wasn't ten people being shot at, so how would you replace the alleged victim with another if there's no one to say that there was another."

¶ 25 In July 2011, defendant inquired by letter into the status of his petition. In August 2011, the circuit court clerk responded by letter that the petition was "[i]n the docket as of August 3, 2011" and that there was "no future court date." The court's first order on the petition was dated May 15, 2012, and stated: "Rachel Hess was appointed to represent [defendant] in his post-conviction petition on April 2, 2012, but it was erroneously put on 07 CF 1840, a closed case." Hess was later permitted to withdraw because of her workload, and new counsel was appointed. In January 2014, new counsel filed an affidavit of compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) as well as a motion for leave to withdraw as counsel. Counsel identified four individual claims raised in defendant's *pro se* petition, and counsel explained why each lacked potential merit. In April 2014, counsel filed an addendum to her motion to withdraw, addressing the potential merit of two additional claims raised in defendant's petition. Neither the original motion nor its addendum addressed the potential merit of, or even acknowledged, defendant's claim that appellate counsel was ineffective for failing to challenge the amendments to the indictment.

¶ 26 The trial court granted counsel's motion to withdraw. Subsequently, the State moved to dismiss the petition. The State recognized that defendant claimed that appellate counsel "was ineffective on the petitioner's direct appeal." However, the State did not recognize that defendant claimed ineffectiveness based on appellate counsel's failure to claim that the amendments to the indictment were improper.

¶ 27 The trial court granted the motion to dismiss, and defendant filed this timely appeal.

¶ 28                                     II. ANALYSIS

¶ 29 Defendant makes several alternative requests for relief in this appeal. His preference is that we assess the merit or potential merit of the claim in his *pro se* postconviction petition that appellate counsel was ineffective for failing to contend on direct appeal that the trial court erred in permitting the State to amend count I by striking the name "Julian Ramos." Defendant's first three alternative choices of relief are (1) an outright reversal of his conviction, (2) a reversal of his conviction and a remand for a new trial, and (3) a remand for a

third-stage evidentiary hearing under the Act. See *People v. Bailey*, 2017 IL 121450, ¶ 18 (petition will advance to third-stage review if it presents a substantial showing of a constitutional violation).

¶ 30    Defendant's fourth alternative choice of relief does not involve our assessing the merit or potential merit of his *pro se* amendment claim. Specifically, defendant argues that the trial court erred in permitting his appointed postconviction counsel to withdraw, because counsel failed to provide the level of assistance required under the Act during second-stage proceedings. See *People v. Greer*, 212 Ill. 2d 192, 204 (2004) (the Act guarantees the petitioner a " 'reasonable' " level of assistance from appointed counsel). In determining whether that level of assistance was provided, we need not—and must not—address the merits of the petition. See *People v. Suarez*, 224 Ill. 2d 37, 51-52 (2007). For the following reasons, we agree with defendant that the trial court erred in allowing counsel to withdraw. Accordingly, we vacate the order of withdrawal and the later dismissal of the *pro se* petition, and we remand for the appointment of new postconviction counsel.

¶ 31    The Act (725 ILCS 5/122-1 *et seq.* (West 2010)) provides a procedural mechanism by which a criminal defendant can assert that his federal or state constitutional rights were substantially violated in his original trial. A postconviction proceeding is not a substitute for a direct appeal but rather is a collateral attack on a prior conviction and sentence. *People v. Davis*, 2014 IL 115595, ¶ 13. For this reason, issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*. *Id.* Moreover, issues that could have been raised on direct appeal, but were not, are considered forfeited. *Id.* However, application of forfeiture principles is relaxed where the forfeiture stems from the ineffective assistance of appellate counsel. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 32    Petitions under the Act are reviewed in distinct stages. The first stage spans the 90-day period following the filing of the petition. Within that 90-day period, the trial court may dismiss the petition if it determines that the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2010). If the court finds that the petition is not so deficient but states the "gist of a constitutional claim" (*People v. Allen*, 2015 IL 113135, ¶ 24), the petition advances to the second stage of review. 725 ILCS 5/122-2.1(b) (West 2010). At the first stage, the State is not permitted any input on the sufficiency of the petition. *Bailey*, 2017 IL 121450, ¶ 19. If the trial court fails to act on the petition within 90 days, it proceeds to the second stage. *Id.* ¶ 18; *Greer*, 212 Ill. 2d at 204 ("Of course, in [this] instance, the petition may well be frivolous or patently without merit, and the defendant is appointed counsel only through the fortuity of the circuit court's inaction.").

¶ 33    At the second stage, the petitioner, if indigent, is entitled to the appointment of counsel. 725 ILCS 5/122-4 (West 2010). The Act guarantees the petitioner a " 'reasonable' " level of assistance from appointed counsel. *Greer*, 212 Ill. 2d at 204. To ensure that the requisite level of assistance is provided, Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013) imposes specific duties on postconviction counsel. If, after demonstrating compliance with Rule 651(c), appointed counsel determines that the *pro se* petition is frivolous or patently without merit, appointed counsel may—and should—move to withdraw from representation. *Greer*, 212 Ill. 2d at 209, 211-12. The court in *Greer* said:

> "We are confident that the legislature did not intend to require appointed counsel to continue representation of a postconviction defendant after counsel determines that defendant's petition is frivolous and patently without merit. Nothing in the Act requires

the attorney to do so, and the attorney is clearly prohibited from doing so by his or her ethical obligations." (Emphasis omitted.) *Id.* at 209.

¶ 34 Also at the second stage, the State is permitted to answer the petition or move to dismiss it. See 725 ILCS 5/122-5 (West 2010). To survive the second stage, the petition must make a substantial showing of a constitutional violation. *Bailey*, 2017 IL 121450, ¶ 18. The court must accept as true all well-pleaded facts that are not positively rebutted by the record. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). Review of a second-stage dismissal is *de novo*. *Id.* Counsel's compliance with Rule 651(c) is also reviewed *de novo*. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 17.

¶ 35 Defendant claims that it was error for the trial court to permit postconviction counsel to withdraw where counsel neither (1) addressed the potential merit of his ineffectiveness claim based on the amendment to the indictment nor (2) demonstrated compliance with Rule 651(c). As defendant recognizes, our review of an order permitting postconviction counsel to withdraw differs depending on whether the *pro se* petition advanced to the second stage because the trial court deemed it potentially meritorious or instead because the trial court took no action on the petition within 90 days of its filing. Under *People v. Kuehner*, 2015 IL 117695, ¶ 27, if the petition advanced because the trial court found potential merit, then "appointed counsel's motion to withdraw must contain at least some explanation as to why *all* of the claims set forth in that petition are so lacking in legal and factual support as to compel his or her withdrawal from the case." (Emphasis added.) The supreme court explained why it placed that burden on appointed counsel:

"[A] request for leave to withdraw as counsel after a first-stage judicial determination that the *pro se* petition is neither frivolous nor patently without merit is an extraordinary request. The reason for this is that, in making such a determination and advancing the petition to the second stage, the trial court is granting the *pro se* defendant the first form of relief afforded by the Act, namely, the appointment of counsel to represent the defendant's interests going forward (725 ILCS 5/122-4 (West 2008)). A subsequent motion to withdraw is effectively an *ex post* request to deny the defendant that very relief, and it comes not from the State but from defendant's own counsel. Accordingly, we have no reservations about requiring appointed counsel to make the case in the motion to withdraw as to why the relief previously granted his or her client should be undone, and to make that case with respect to each and every *pro se* claim asserted." (Emphasis omitted.) *Id.* ¶ 22.

In *Kuehner*, the court found that appointed counsel's motion to withdraw was inadequate because it did not address the potential merit of all claims in the *pro se* petition. *Id.* ¶ 23. The court vacated the orders permitting counsel to withdraw and dismissing the petition, and the court remanded for appointment of new postconviction counsel. *Id.* ¶ 27.

¶ 36 The court in *Kuehner* contrasted the facts before it with the facts in *Greer*, where the *pro se* petition advanced to the second stage through the trial court's failure to act upon it within 90 days. In *Greer*, appointed counsel's motion to withdraw stated that the petition lacked merit because counsel was unable to " 'properly substantiate' " any of its claims. *Greer*, 212 Ill. 2d at 200. The trial court granted the motion to withdraw and dismissed the petition. The supreme court affirmed the trial court. The court disapproved of appointed counsel's terse assessment of the defendant's *pro se* claims, as "[a]n attorney moving to withdraw should make some effort to explain *why* defendant's claims are frivolous or patently without merit." (Emphasis in

original.) *Id.* at 212. The court nonetheless affirmed the order permitting counsel to withdraw, because it "appear[ed] that counsel fulfilled his duties as prescribed by Rule 651(c), and the record *** support[ed] counsel's assessment that the defendant's postconviction claims were frivolous and without merit." *Id.*

¶ 37    The court in *Kuehner* recognized that the language in *Greer* has engendered "some measure of confusion" in the appellate courts over whether appointed counsel's motion to withdraw is properly granted where the motion fails to provide some explanation as to why each of the claims in the *pro se* petition lacks potential merit. *Kuehner*, 2015 IL 117695, ¶ 16. The court in *Kuehner* declined to "resolv[e] that tension," however, because the facts before it were so different from the facts in *Greer*. *Id.* ¶ 18.

¶ 38    In *People v. Komes*, 2011 IL App (2d) 100014, this court took a side in the debate over how to interpret *Greer*. We read *Greer* to hold that, even where the petition advances to the second stage through the trial court's inaction, appointed counsel's motion to withdraw must address the potential merit of all claims in the *pro se* petition. Nonetheless, we acknowledged that, under *Greer*, judicial economy sometimes dictates affirming the grant of leave to withdraw even where the motion to withdraw is deficient:

> "Although the *Greer* court specified that a motion to withdraw should address all of a petitioner's claims, it also recognized that, under proper circumstances, the futility of the representation is clear in spite of flaws in the motion. If the record shows that counsel did everything required of him or her under Rule 651(c) and that all the claims in the original petition were patently without merit, then it serves no purpose to reverse a grant of leave to withdraw simply because of insufficiencies in the motion." (Emphasis omitted.) *Id.* ¶ 30.

*Komes* properly construed *Greer*. Accordingly, where appointed counsel is allowed to withdraw from representation on a postconviction petition that advanced to the second stage automatically because of the trial court's inaction, we will uphold the withdrawal if (1) counsel complied with Rule 651(c) and (2) the record demonstrates that the claims in the *pro se* petition were frivolous or patently without merit.

¶ 39    In the present case, the petition advanced to second-stage review because the trial court did not act upon it within 90 days of its filing. The first order in the record relating to the October 2010 petition is the May 2012 order appointing counsel. Even if we can infer from the clerk's August 2011 letter to defendant that the petition was docketed for second-stage review as of August 2011, we cannot infer that it was docketed earlier than August 2011, which was still beyond the 90-day window.

¶ 40    Therefore, our review proceeds under *Greer* rather than *Kuehner*. We hold that the trial court erred in permitting counsel to withdraw because counsel failed to demonstrate compliance with Rule 651(c). The Act entitles a postconviction petitioner to a " 'reasonable' " level of assistance by counsel. *Greer*, 212 Ill. 2d at 204. To ensure that the petitioner receives that level of assistance, Rule 651(c) provides that postconviction counsel must (1) "consult[ ] with petitioner *** to ascertain his or her contentions of deprivation of constitutional rights," (2) "examine[ ] the record of the proceedings at the trial," and (3) "[make] any amendments to the petition filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). Thus, "[o]ne of postconviction counsel's duties is to ascertain the petitioner's claims." *Komes*, 2011 IL App (2d) 100014, ¶ 32.

Compliance with Rule 651(c) may be demonstrated though a certificate filed by counsel or through the record as a whole. *People v. Lander*, 215 Ill. 2d 577, 584 (2005).

¶ 41　　The record indicates that appointed counsel failed to recognize defendant's amendment claim among the multiple claims in his *pro se* petition. In the Rule 651(c) certificate that counsel filed with her motion to withdraw, she stated that she (1) "reviewed [defendant's] *pro se* filings concerning [this] matter," (2) "examined the entire record to ascertain any errors or constitutional deprivations," and (3) "consulted with [defendant] in person concerning potential issues." In her motion to withdraw, counsel stated that she consulted with defendant on specific dates "to ascertain and discuss his contentions of deprivation of constitutional rights." She further stated that she "reviewed the entire record available to her *** and *** concluded that [defendant's] petition present[ed] no issue of merit upon which [defendant] could expect to obtain relief." Counsel then purported to state what, "[i]n short, the petition and its related documents allege." She set forth four individual claims and explained why they lacked potential merit. Several months later, counsel filed an "addendum" to the motion to withdraw. Counsel noted that the trial court had asked her to "address two additional points found in [the] post conviction petition," which counsel failed to address in her motion to withdraw. Counsel proceeded to address two additional claims and explain why they were not potentially viable. At the hearing on the motion to withdraw, counsel asserted that, in her motion, she "went through the issues and stated *** positions and case law to address *each one*." (Emphasis added.)

¶ 42　　Thus, counsel confirmed at the hearing that her motion purported to recapitulate the claims of the petition as she understood them. However, in neither her original motion nor its addendum did counsel acknowledge the amendment claim. This was because, we infer, counsel did not discern the claim among the others. Counsel's oversight was perhaps understandable, given the length and density of the *pro se* petition, but counsel was not thereby excused from compliance with Rule 651(c)'s mandate that she "ascertain [defendant's] contentions of deprivation of constitutional rights." Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). "Unless the record shows that counsel has, in fact, ascertained the petitioner's claims, we cannot assume that the claims are in their final form, and deciding their frivolity is likely to be premature." *Komes*, 2011 IL App (2d) 100014, ¶ 32.

¶ 43　　We recognize that a reviewing court has permission under *Greer* to affirm the grant of a motion to withdraw even where counsel has not explained why each of the petitioner's claims lacks potential merit. But *Greer* was unequivocal that the reviewing court cannot relieve counsel of his or her duty under Rule 651(c) to ascertain the petitioner's claims. *Greer*, 212 Ill. 2d at 212. Counsel in *Greer* at least understood what the *pro se* petition contained. Counsel "stated, as to each issue raised in defendant's *pro se* petition, that counsel could not 'properly substantiate' the claim." *Id.* at 195. Obviously, it is imperative that counsel ascertain what the *pro se* petition actually contains before asserting to a court that the petition lacks potential merit. We stress that we do not read *Greer* as prescribing any particular form for a motion to withdraw. Our holding is simply that here, though counsel attempted twice to state the claims in the *pro se* petition, we cannot conclude that counsel ascertained the claim that she failed to mention in those two tries.

¶ 44　　Given counsel's apparent failure to discern the amendment claim, we cannot deem the claim to have been in its "final form" when the trial court evaluated its potential merit. It would likewise be premature for us, on review, to judge the claim's potential merit. See *Suarez*, 224

Ill. 2d at 52 (harmless-error analysis does not apply to Rule 651(c) violations, as "compliance must be shown regardless of whether the claims made in the *pro se* or amended petition are viable").

¶ 45     We therefore vacate the orders permitting counsel to withdraw and later dismissing the *pro se* petition. Given the particular circumstances of this case, we grant defendant's request for the appointment of new postconviction counsel. We provide the same direction that we did in *Komes*:

> "On remand, the [trial] court should not grant any motion to withdraw unless counsel documents Rule 651(c) compliance. Further, any motion to withdraw that counsel files should demonstrate the frivolity of every claim of defendant's." *Komes*, 2011 IL App (2d) 100014, ¶ 36.

¶ 46                                    III. CONCLUSION

¶ 47     For the foregoing reasons, we vacate the orders permitting defendant's appointed counsel to withdraw and dismissing defendant's *pro se* postconviction petition. We remand for further proceedings as directed.

¶ 48     Vacated and remanded with directions.