NOTICE

Decision filed 12/08/20, corrected 04/08/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170339-U

NO. 5-17-0339

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 93-CF-501 |
| | ) | |
| FREDERICK ROKITA, | ) | Honorable |
| | ) | William G. Schwartz, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's appointed counsel did not fail to provide reasonable assistance in postconviction proceedings, and the trial court did not err in granting appointed counsel's motion to withdraw and dismissing defendant's *pro se* successive postconviction petition. Further, defendant is not entitled to a remand for a *Krankel*-like inquiry into postconviction counsel's reasonableness under *People v. Custer*, 2019 IL 123339.

¶ 2    Defendant, Frederick Rokita, appeals from the trial court's order granting his postconviction counsel's motion to withdraw and dismissing "the post-conviction proceedings initiated by the defendant." The defendant argues that postconviction counsel, Kelley Zuber, provided unreasonable assistance when Zuber sought to withdraw from representing the defendant, rather than filing an amended successive postconviction

1

petition on the defendant's behalf. The defendant submits that Zuber could have amended the defendant's *pro se* successive petition to include a claim of actual innocence, supported by evidence that the victim had impaired vision, the inconclusive results of certain DNA testing, and the alleged correspondence between the defendant's brother and the victim's daughter via MySpace that implicated someone else committed the crimes. The defendant also contends that Zuber could have made a claim that the defendant's convictions for aggravated criminal sexual assault should be vacated because residential burglary could not serve as the aggravating felony for aggravated criminal sexual assault. The defendant asks this court to remand his case for further second stage proceedings. As an alternative remedy, the defendant asks this court to remand his case for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), to determine whether Zuber provided reasonable assistance of counsel. For the following reasons, we affirm the trial court's order allowing Zuber to withdraw and dismissing the defendant's *pro se* successive postconviction petition.

¶ 3                                I. BACKGROUND

¶ 4     The defendant was tried and convicted of five counts of aggravated criminal sexual assault and one count each of home invasion, residential burglary, and theft. Each count of aggravated criminal sexual assault listed residential burglary as the aggravating factor. At

2

a bench trial, presided over by the Honorable Judge David Watt,[1] the following evidence relevant to this appeal was produced.

¶ 5    On November 13, 1993, at approximately 7 a.m., C.S. was lying on her bed inside her mobile home in the Carbondale Mobile Home Park. She was seven months pregnant at the time. C.S. had just turned off her alarm and noticed that her daughters, ages six and four, were awake, when she also heard dishes rattling in the kitchen. She got out of bed to investigate and saw a man standing at the end of the hallway. C.S. thought the man was her boyfriend, Joe Printy, and she called out his name. The man did not reply but charged down the hallway. C.S. testified that the man stopped and stood approximately seven inches from her face. The man grabbed C.S., and they stared at each other for approximately 15 to 20 seconds. The man then ordered C.S. to go in her bedroom and lie on her stomach with a blanket over her head. C.S. was unable to lie on her stomach, so she got on her hands and knees and put the blanket over her head. The man pinned C.S. down and asked when her boyfriend would return. After C.S. told the man that her boyfriend was at school, he began to remove her underwear. The man stated that C.S.'s boyfriend had been sleeping around and owed the man $1300. C.S. told him that she had $260 in a shoebox on her vanity and thought she heard the man retrieve the money from the shoebox. The man then began to sexually assault C.S.

---

[1]During the course of the defendant's case, from its inception through this appeal, several different trial court judges presided over the defendant's case. For clarity throughout this order, we will refer to each judge individually, rather than as "the trial court."

¶ 6    During the sexual assault, C.S. was told to either keep her eyes closed or place bedding over her face. The man also went to her daughters' bedroom and threatened to hurt them if they did not stay in their room. C.S. testified that the man vaginally penetrated her and forced her to perform oral sex multiple times. C.S. confirmed that the man never ejaculated. While being forced to perform oral sex a second time, C.S. ran out of the bedroom and into the hallway. The man chased her, and they struggled in the hallway. C.S.'s daughter, Rachel,[2] came out of her bedroom and witnessed the struggle. C.S. then escaped outside and ran to a neighbor's trailer for help. As C.S. was knocking on her neighbor's door, the man stood at the front of C.S.'s trailer, "less than two feet" from C.S., for a period of 30 to 40 seconds. Several days after the attack, C.S. assisted a sketch artist in preparing a composite sketch of her attacker. C.S. also indicated that her attacker wore a plaid shirt. At trial, C.S. identified the defendant as the man who attacked her.

¶ 7    On November 23, 1993, the defendant was arrested by a police officer who noticed a resemblance between the defendant and the composite sketch of C.S.'s attacker. Law enforcement executed a search warrant on the defendant's home and found two pictures of him wearing a plaid shirt. When law enforcement showed C.S. the photographs, she recognized the defendant as her attacker. She also recognized the plaid shirt the defendant wore in the photograph as the shirt her attacker wore.

¶ 8    Chris Stark testified that the defendant was staying in Stark's mobile home at the Green Acres trailer park. Stark stated that on November 13, 1993, at around 3 a.m., he and

---

[2]The victim's daughter, Rachel, was not called as a witness at trial.

4

the defendant had an argument. The defendant left and walked in the direction of the Carbondale Mobile Home Park. Stark testified that the defendant was wearing a "coat-type flannel shirt" over a regular flannel shirt.

¶ 9 Peggy Huffstutler, who also lived in the Carbondale Mobile Home Park, testified that she was awakened by a knock at her door at approximately 5 a.m. on November 13, 1993. She answered the door and spoke to a man through her screen door for about five minutes. The man asked if "Jason" lived there and where trailer 456 was. The man left after standing around for approximately five minutes. Huffstutler further testified that the man returned about 30 minutes later and knocked on her door again. The man again asked about trailer 456 and began to curse about the people who lived in the trailer court. The man then asked if he could use Huffstutler's phone. Huffstutler told the man that she did not have a phone, and the man left. At trial, Huffstutler identified the defendant as the man she encountered on the morning of November 13.

¶ 10 Several items of evidence were collected and sent to the police crime lab, including a pair of underwear and bedding from the victim's bedroom. C.S. was taken to the hospital where sexual assault evidence was collected, including vaginal and rectal swabs, as well as blood and saliva samples. Law enforcement also collected "sexual assault kits" from C.S.'s boyfriend and the defendant.

¶ 11 After the State concluded its evidence, the defendant presented evidence regarding the forensic testing of the evidence collected. At the Southern Illinois Forensic Science Center, sperm cells were found on the rectal swab but not the vaginal swab. The vaginal swab did, however, test positive for the presence of semen. The samples from the vaginal

5

and rectal swabs, as well as blood standards from both the defendant and C.S., were then forwarded to the Illinois State Police Forensic Science Laboratory in Springfield, Illinois, for DNA analysis. David Metzger, the research coordinator who performs DNA analysis for the Springfield lab, attempted to perform a type of DNA testing known as "restriction fragment length polymorphism" (RFLP) on the samples. The RFLP procedure failed to develop a DNA profile from the rectal swab and only produced C.S.'s DNA profile from the vaginal swab. Metzger testified that the RFLP procedure required a certain amount of DNA in order to develop a profile, and that RFLP analysis is more successful in developing a profile when ejaculation occurs. Metzger further testified that he made no findings that eliminated defendant as a suspect in this case.

¶ 12    Following the conclusion of the defendant's evidence, Judge Watt heard arguments from the parties. In the defendant's closing argument, trial counsel argued that C.S. was mistaken in her identification of the defendant and pointed out the lack of DNA evidence linking the defendant to the crimes charged. After both sides had concluded, Judge Watt reserved his ruling on the home invasion count, but stated, "I can tell all of you very honestly I have no question about the rest of these counts. You couldn't have found a better witness. [C.S.] is a tough lady." Judge Watt then found the defendant guilty of five counts of aggravated criminal sexual assault, residential burglary, and theft. The next day, Judge Watt found the defendant guilty of home invasion. The defendant was subsequently sentenced to 80 years in the Illinois Department of Corrections.

¶ 13    In his direct appeal, the defendant argued, *inter alia*, that his residential burglary conviction must be vacated because the residential burglary offense was the aggravating

felony for his aggravated criminal sexual assault convictions. This court agreed with the defendant and vacated his conviction for residential burglary but affirmed his other convictions. *People v. Rokita*, 284 Ill. App. 3d 1153 (1996) (unpublished order under Supreme Court Rule 23). The defendant petitioned for leave to appeal to the Illinois Supreme Court but was denied. *People v. Rokita*, 175 Ill. 2d 549 (1997).

¶ 14    On April 14, 1997, while the defendant's petition for leave to appeal was pending, he filed a *pro se* petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 1996)). The next day, Judge Watt dismissed the petition as frivolous and patently without merit, and the defendant appealed. His appeal was ultimately dismissed by this court for want of prosecution. *People v. Rokita*, No. 5-97-0285 (June 30, 1998) (unpublished order).

¶ 15    On April 14, 1999, the defendant filed a motion for forensic testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 1998)) and a memorandum in support of the motion. Judge Watt held a hearing and denied the defendant's motion. The defendant appealed. This court reversed the trial court's order, finding that identity was the issue at defendant's trial, and that the results of DNA testing requested by defendant had the potential to produce new, noncumulative evidence materially relevant to his assertion of actual innocence. See *People v. Rokita*, 316 Ill. App. 3d 292 (2000). Following this court's ruling, on December 28, 2000, the Honorable Judge Thomas H. Jones entered an agreed-upon order requiring that several items of evidence be delivered to Forensic Science Associates for DNA testing.

¶ 16 Meanwhile, on December 22, 2000, the defendant filed a *pro se* successive postconviction petition, alleging that his extended term sentence and consecutive sentences were unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Judge Jones dismissed the successive petition, and this court affirmed the dismissal via summary order. *People v. Rokita*, No. 5-01-0217 (June 3, 2003) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 17 On October 23, 2002, the defendant filed a hybrid pleading titled, "Petition for Post Conviction Relief and Motion for Scientific Testing." Defendant attached several documents to this successive petition, which included a purported report from Forensic Science Associates dated August 22, 2001. The report stated that defendant was eliminated as the source of a spermatozoa found in C.S.'s underwear, but C.S.'s boyfriend could not be eliminated. No action was taken on this successive petition. On October 19, 2004, the defendant subsequently filed an "Amended Petition for Post Conviction Relief and Motion for Additional Forensic Testing".[3] In this pleading, the defendant claimed, *inter alia*, that newly discovered evidence established his actual innocence; counsel who represented the defendant for purposes of DNA testing failed to submit items of evidence for testing; C.S. is required to wear corrective lenses while driving which affected her ability to identify her assailant; and the defendant's convictions for aggravated criminal sexual assault were void

---

[3]This pleading, which is the principal subject of this appeal, is a combined successive postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 1996)) and a motion for DNA testing pursuant to 725 ILCS 5/116-3 (West 1998). For clarity, we will refer to the portion of defendant's pleading seeking relief under the Post-Conviction Hearing Act as defendant's "*pro se* successive petition" and the portion of defendant's pleading seeking relief pursuant to section 116-3 as "motion for DNA testing."

"and should be vacated as lesser included offenses." The defendant also stated in the petition that the sexual assaults "were not committed during the 'commission' of the residential burglary, and therefore are void and should be vacated." The defendant attached several documents to the *pro se* successive petition and motion for DNA testing, which included a letter from a private investigator stating that C.S. wears corrective lenses for driving and the report from Forensic Science Associates referenced above.

¶ 18    No action was taken on the defendant's *pro se* successive petition until May 16, 2007, when the Honorable Judge Charles Grace appointed counsel John McDermott to represent the defendant. The court's docket entry stated as follows:

> "Court reviews file, notes the file first came to this Court's attention in late April 2007, where Amended Post Conviction Relief filed. Court appoints attorney John McDermott to represent defendant. Clerk to set for status hearing on all pending matters with notice to counsel. State to prepare Habeas Corpus Order for defendant."

Subsequently, Judge Grace stated that he set the matter for a hearing because the defendant's pleadings had been pending for a significant period of time. At the hearing held on June 14, 2007, McDermott requested additional time to amend the defendant's *pro se* successive petition. McDermott also informed Judge Grace that defendant had contracted with the Innocence Project who could potentially become involved in the case.

¶ 19    Following the hearing, on August 15, 2007, attorney Chris Cooley of the Innocence Project entered his appearance for the defendant. Cooley also filed a supplemental motion for postconviction fingerprint and forensic DNA testing. That same day McDermott filed

9

a certificate stating that he had consulted with defendant to ascertain his contentions of deprivation of constitutional rights, reviewed the record of proceedings, and would defer to the Innocence Project to make any amendments to defendant's *pro se* successive petition that were necessary for an adequate presentation of defendant's contentions. Thereafter, the State filed a motion to dismiss the defendant's *pro se* successive petition and to deny defendant's request for supplemental fingerprint and DNA testing. In this motion, the State argued that defendant's *pro se* postconviction claims should be dismissed for failure to obtain leave of court and that his motion for additional DNA testing should be dismissed because additional DNA testing had already been completed.

¶ 20 Following a hearing on September 20, 2007, Judge Grace granted the defendant's supplemental motion for postconviction fingerprint and forensic DNA testing. No ruling was made on the State's motion to dismiss as it pertained to the defendant's pending successive postconviction claims. On October 2, 2008, the trial court entered an agreed-upon order for the submission of items of evidence for additional testing. These items included C.S.'s underwear and a bed sheet. The testing was to be completed by Orchid Cellmark, a DNA and forensic testing company.

¶ 21 Over the next two years, the defendant filed several motions seeking to have McDermott and Cooley removed from the defendant's case. The defendant disagreed with how McDermott and Cooley were handling the defendant's case. On February 5, 2010, Cooley requested, and was granted, leave to withdraw as the defendant's counsel. McDermott also filed a motion to withdraw, and the court granted this motion on July 19, 2011. Judge Grace then appointed Michael Burke, on October 11, 2011, to represent the

10

defendant. Burke took no action on the defendant's behalf, and Kelley Zuber was substituted for Burke on September 15, 2014.

¶ 22 Over a year later, on December 21, 2015, the Honorable Judge Kimberly Dahlen held a hearing to determine the status of the defendant's case. Judge Dahlen informed the parties that she had not read the defendant's *pro se* postconviction pleadings but denied the State's motion to dismiss that was filed in 2007. Zuber advised Judge Dahlen that he was trying to obtain the results of the additional DNA testing performed by Orchid Cellmark so that the defendant could have the results reviewed by an expert.

¶ 23 On August 22, 2016, Judge Dahlen held another status hearing. At this hearing, Zuber informed Judge Dahlen that defendant wished to have the matter continued so that the defendant could have additional DNA testing completed. Zuber believed, however, that requests for additional DNA testing fell outside the scope of his representation as appointed counsel because requests for DNA testing were not covered under the Post-Conviction Hearing Act, but rather under a motion for DNA testing pursuant to section 116-3. Zuber opined that the defendant would need to hire separate counsel for any such request. When asked about the current DNA findings, Zuber stated that the results did not "rule [defendant] out." Judge Dahlen granted Zuber an additional 30 days to file an amended postconviction petition and referred defendant's case to the Honorable Judge William Schwartz for further proceedings.

¶ 24 On September 14, 2016, Zuber filed a motion to withdraw pursuant to *People v. Greer*, 212 Ill. 2d 192 (2004), because he concluded that he could not make any amendments to defendant's *pro se* successive postconviction petition pursuant to Illinois

11

Supreme Court Rule 651(c) (eff. Feb. 6, 2013). At the hearing on Zuber's motion, Zuber stated, again, that he did not believe he could file an amended postconviction petition on defendant's behalf. Zuber opined that the defendant's arguments were either waived, without legal merit, or had already been decided. Zuber also reaffirmed his belief that further requests for DNA testing were beyond the scope of his representation. At the hearing before Judge Schwartz, the defendant stated that he wanted "the full CODIS DNA profile testing" completed. Judge Schwartz took the matter under advisement.

¶ 25    On November 16, 2016, the defendant filed a motion for substitute counsel, alleging that Zuber had failed to reasonably represent the defendant, and attached to the motion were several letters from Zuber and one letter that the defendant sent to Zuber. The defendant's motion alleged that Zuber indicated in a letter that he could amend defendant's petition to include two claims. First, the victim was required to wear corrective lenses which affected her identification. The second claim involved correspondence between the defendant's brother and C.S.'s daughter on MySpace. The defendant stated in his pleading that C.S.'s daughter identified her mother's attacker as a neighbor.

¶ 26    On January 3, 2017, the defendant filed a supplement to his motion for substitute counsel and attached an affidavit from Dr. Karl Reich, the chief scientific officer of Independent Forensics of Illinois. In the affidavit, Dr. Reich averred that he had been retained by the defendant "to provide a professional, scientific perspective for the forensic methods, screening tests and DNA profile results" in defendant's case. Dr. Reich's affidavit noted the restrictions in identifying a suspect based on the DNA testing done by Orchid Cellmark and opined that "the only way to obtain definitive identification, or exclusion, of

12

[defendant] *** is to perform somatic/autosomal CODIS DNA profiling on the extracted DNA" from the bed sheet. In this motion, the defendant alleged that Zuber had a copy of the Dr. Reich affidavit.

¶ 27 On February 1, 2017, Judge Schwartz, citing *People v. Kuehner*, 2015 IL 117695, entered an order finding that Zuber was required to explain to the court why the defendant's *pro se* successive petition was frivolous or patently without merit. Thereafter, Zuber filed an amended motion to withdraw and a brief in support of the motion. In the motion, Zuber stated that he consulted with the defendant by phone and mail to ascertain the defendant's contentions of deprivation of constitutional rights and examined the record of proceedings at trial. Zuber claimed he was unable to make any amendments to the amended postconviction petition "that would be in compliance with the applicable law and allow Attorney Zuber to file a certificate pursuant to Illinois Supreme Court Rule 651(c)." Zuber further asserted that the defendant requested Zuber withdraw as counsel. In the brief in support of his motion, Zuber offered his analysis as to why he concluded each of the defendant's claims in his *pro se* successive petition were frivolous and patently without merit.[4]

¶ 28 Zuber's brief first addressed the defendant's claim that his convictions for aggravated criminal sexual assault were void and must be vacated. Defendant also argued that he could not be sentenced to an extended term on count III (aggravated criminal sexual assault) because of the underlying residential burglary. Zuber believed the defendant

---

[4]The defendant has made numerous claims throughout his postconviction proceedings; however, we will only address those necessary to resolve defendant's contentions on appeal.

13

"waived" these arguments and that they would not have been successful on appeal. Zuber noted that the defendant had successfully argued in his direct appeal that his residential burglary conviction should be vacated because it was necessarily included in the offense of aggravated criminal sexual assault. Zuber also stated that the "residential burglary takes place during the time that the person remains within the dwelling" and cited to the residential burglary statute in effect at the time Zuber filed his amended motion to withdraw. 720 ILCS 5/19-3(a) (West 2016). Zuber went on to say that the sexual assaults took place while the perpetrator remained within the residence, and that the trial court found that the burglary and sexual assaults were a single course of conduct. Finally, Zuber added that this court had already ruled on the issue of an extended term sentence for the aggravated criminal sexual assault charged in count III, and thus defendant's claims were *res judicata*.[5]

¶ 29    The defendant also claimed actual innocence. In response to this argument, Zuber offered an explanation regarding whether the DNA evidence, C.S.'s vision, and the MySpace correspondence would support the defendant's claim of actual innocence. First, Zuber discussed the results of the DNA testing that had been performed in the defendant's case. Zuber listed the requirements to make an actual innocence claim and cited to our supreme court's decision in *People v. Coleman*, 2013 IL 113307. Zuber concluded that the

---

[5]In the direct appeal of his conviction, the defendant argued that he could not be sentenced to an extended term sentence on count III (aggravated criminal sexual assault) because his conduct was not extremely brutal and heinous and was inherent in his offense. This court disagreed and affirmed the defendant's conviction and sentence with respect to this issue. *People v. Rokita*, 284 Ill. App. 3d 1153 (1996) (unpublished order under Supreme Court Rule 23).

14

DNA testing results from Orchid Cellmark would be considered new evidence. He did not, however, believe that the results could support a claim of actual innocence because the defendant was not excluded as a contributor to the DNA sample found on C.S.'s bed sheet. Zuber noted that Dr. Reich's affidavit stated that more DNA testing would be needed to establish whether DNA implicated or excluded the defendant. Zuber opined that, even if the defendant was excluded, this fact would not overcome C.S.'s identification of the defendant "unless a new profile from the sperm fraction showing a different assailant could be determined." Zuber concluded that the Orchid Cellmark testing results were not sufficient to support a claim of actual innocence.

¶ 30    The record does not reveal whether the DNA testing results from Orchid Cellmark were ever reviewed by any of the judges presiding over the defendant's case. The purported Orchid Cellmark records were, however, attached to several *pro se* pleadings filed by the defendant. The Orchid Cellmark report dated June 26, 2009, indicated that C.S.'s underwear and a bed sheet were tested for DNA. The defendant and C.S.'s boyfriend were excluded as contributors to the "partial Y-STR profile" obtained from C.S.'s underwear. For the bed sheet, a "partial Y-STR profile" was developed from both an "epithelial fraction" and a "sperm fraction." The epithelial fraction contained "a mixture of at least two males." The defendant could not be excluded as a contributor to the epithelial fraction, but C.S.'s boyfriend was excluded. The defendant also could not be excluded as the predominant contributor to the sperm fraction obtained from the bed sheet. C.S.'s boyfriend was, however, excluded as a contributor. The report explained that, due to parental

15

inheritance of the Y chromosome, all males from the same male lineage are expected to share the same "Y-STR profile."

¶ 31 Next, Zuber addressed the defendant's claim regarding C.S.'s impaired vision. Zuber observed that no cross-examination regarding C.S.'s vision occurred at trial, and whether C.S. had any vision deficiencies at the time of the attack was unknown. Zuber also recognized that Judge Watt heard C.S.'s testimony and found her to be an "excellent" witness. Zuber concluded that C.S.'s current need for corrective eyewear to drive was insufficient to support a claim of actual innocence.

¶ 32 Finally, Zuber addressed the purported statement from C.S.'s daughter, Rachel Gratias, on MySpace that potentially implicated a neighbor. Zuber presumed that Gratias's statement could not be authenticated. He also doubted that the alleged statements from Gratias would "have been made on personal knowledge as opposed to hearsay" given Gratias's young age at the time of the attack. Zuber's memorandum concluded that he had considered all factors for actual innocence and did not believe that the evidence, even when taken together, supported a claim of actual innocence.

¶ 33 On April 7, 2017, the defendant filed a response to Zuber's amended motion to withdraw, disputing Zuber's assessment of Dr. Reich's affidavit. The defendant also filed a "Supplemental Postconviction Petition." In his supplemental petition, defendant included an allegation that his brother had corresponded with Gratias on MySpace and that she implicated a neighbor, who allegedly watched Gratias and her sister play in the yard. The defendant stated that the MySpace correspondence was given to Zuber and was no longer in the defendant's possession. The defendant stated that Zuber agreed to request an

16

affidavit from the defendant's brother and "brief this issue." Attached to his supplemental postconviction petition, among other things, was a purported police report from the Jackson County Sheriff's Department dated November 13, 1993. This report stated that C.S. had a daughter, "Rachel," who was six years old and present in the home at the time of the attack.

¶ 34 On August 9, 2017, Judge Schwartz granted Zuber's amended motion to withdraw. Citing *Kuehner*, Judge Schwartz found that Zuber's amended motion to withdraw and the brief in support were " 'filed subsequent to a trial court's affirmative decision to advance the petition to the second stage' " and brought " 'to the trial court's attention information that was not apparent on the face of the *pro se* petition at the time such assessment was made.' " Judge Schwartz then concluded that "[b]ased on a review of the information the post-conviction petition of the defendant should be denied."

¶ 35 On August 11, 2017, the defendant filed a "Motion to Bring Forth Exhibits Compel the Appointment of Substitute Counsel and Schedule a Status Hearing." The motion had been placed in the mail on August 8, 2017, prior to Judge Schwartz's decision to dismiss the defendant's *pro se* successive petition. In the defendant's motion, he reasserted his claim regarding his brother's MySpace correspondence with Gratias and attached a copy of the correspondence to the motion. Per the MySpace correspondence, defendant's brother, Ray Rokita, sent Gratias a message on December 23, 2008, asking if she ever lived in Carbondale, Illinois. On March 31, 2009, Gratias responded that she had not lived in Carbondale since she was five years old. Ray told Gratias he was trying to reach C.S. but could not find her. Gratias responded that Ray must know who raped her mom, and Gratias stated she "saw it." Ray told Gratias that he was investigating what happened and "we

cannot find any D.N.A. [*sic*] that belongs to [F]red." Gratias told Ray that she knew "what the guy looks like." Gratias also told Ray that the man used to watch Gratias and her sister play outside, and that the man lived "beside" their trailer. She further stated, "[I] don't know why my sister and [I] went to testify but [I] failed school that year [I] went in a shock [I] had to learn everything over." When defendant's brother asked Gratias for the neighbor's name, she responded "has [*sic*] anyone in your family was [*sic*] a police officer that's who lived there." In the motion, the defendant requested that the trial court set the defendant's case for a status hearing and appoint new counsel. The trial court denied the motion the same day it was filed. This appeal follows.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, the defendant claims that Zuber failed to provide reasonable assistance of counsel because his amended motion to withdraw did not demonstrate that certain postconviction claims made by the defendant were frivolous or patently without merit. The defendant contends that Zuber could have amended the defendant's *pro se* successive petition to include the following claims. First, defendant submits that C.S.'s need for corrective eyewear, the contradictory DNA evidence, and the MySpace correspondence, taken together, support a claim of actual innocence. Defendant also argues that Zuber should have amended the defendant's *pro se* successive petition to include a claim that the defendant's aggravated criminal sexual assault convictions should be vacated because residential burglary could not serve as the aggravating felony. The defendant requests that we reverse the trial court's order and remand this case for further second stage proceedings.

18

As an alternative remedy, defendant asks this to court remand defendant's case for a *Krankel*-like inquiry into the reasonableness of Zuber's assistance.

¶ 38    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 1996)) provides a statutory remedy for criminal defendants claiming a substantial violation of their constitutional rights and is not a substitute for a direct appeal. *People v. Edwards*, 2012 IL 111711, ¶ 21. Rather, proceedings under the Act are collateral proceedings which allow for review of constitutional issues that were not, and could not have been, adjudicated on direct appeal. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009). Thus, issues that were resolved on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised, but were not, are forfeited. *Id.* Considering these principles and the language of the Act, our supreme court has made it clear that only one postconviction proceeding is contemplated under the Act. *Edwards*, 2012 IL 111711, ¶ 22. Nevertheless, the bar against successive proceedings will be relaxed when the defendant establishes either "cause and prejudice" for failure to raise a claim earlier or a fundamental miscarriage of justice based on actual innocence. *Id.* ¶¶ 22-23.

¶ 39    Before a defendant may file a successive postconviction petition, the defendant must obtain leave of court. *People v. Jackson*, 2015 IL App (3d) 130575, ¶ 13. A request for leave to file a successive petition based on either cause and prejudice or actual innocence is reviewed under a higher standard than that applicable to the first stage of an initial postconviction petition, which only requires that the petition is not frivolous or patently without merit. *Edwards*, 2012 IL 111711, ¶¶ 25-29; *People v. Smith*, 2014 IL 115946, ¶ 35. At this stage, all well-pleaded allegations in the petition and supporting documentation that

19

are not positively rebutted by the record are to be taken as true. *People v. Sanders*, 2016 IL 118123, ¶¶ 42, 48. Accordingly, leave of court to file a successive postconviction petition should be denied where, following a review of the defendant's successive petition and supporting documentation, the claims alleged by the defendant fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings. *Smith*, 2014 IL 115946, ¶ 35.

¶ 40 In the absence of a request by defendant for leave to file a successive petition, the trial court may *sua sponte* consider whether the successive petition should be docketed for second stage proceedings. *Sanders*, 2016 IL 118123, ¶ 28. Here, the defendant neither requested, nor did Judge Grace specifically grant the defendant, leave to file a successive petition. We may presume, however, that Judge Grace granted the defendant leave to file the petition because Judge Grace reviewed defendant's court file, appointed counsel, and directed counsel to file any amended petition that might be appropriate. See *People v. Johnson*, 2018 IL App (5th) 140486, ¶¶ 42-45. In *Johnson*, the trial court docked the defendant's initial postconviction petition for second stage proceedings and appointed counsel without making a finding that the defendant's petition stated the gist of a constitutional claim. *Id.* ¶ 42.

¶ 41 If leave of court is granted, the successive petition is docketed for second stage proceedings. *Sanders*, 2016 IL 118123, ¶¶ 25-28. In the second stage, the trial court may appoint counsel to represent the defendant and make any amendments to the petition deemed necessary. *People v. Bailey*, 2017 IL 121450, ¶ 18. In proceedings under the Act, a defendant is only entitled to a "reasonable" level of assistance, which is lower than the

standard of assistance required under the federal and state constitutions. *People v. Perry*, 2017 IL App (1st) 150587, ¶ 26. To provide reasonable assistance, postconviction counsel must comply with Rule 651(c), which imposes certain duties upon counsel. *Johnson*, 2018 IL App (5th) 140486, ¶ 25. Rule 651(c) requires that counsel consult with defendant to ascertain the defendant's contentions of deprivation of constitutional rights, examine the record of proceedings at trial, and make any necessary amendments to the *pro se* petition to ensure defendant's contentions are adequately presented to the trial court. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). If a claim is frivolous or spurious, ethical obligations prevent postconviction counsel from advancing such claims. *Perry*, 2017 IL App (1st) 150587, ¶ 26. Therefore, when postconviction counsel investigates the defendant's claims and finds them without merit, counsel may stand on the allegations in the *pro se* petition and inform the trial court of the reason the *pro se* petition was not amended or move to withdraw. *Id.*

¶ 42   In the present case, Zuber did not file a certificate demonstrating compliance with Rule 651(c). Zuber's amended motion to withdraw, however, stated that Zuber consulted with the defendant by phone and mail to ascertain the defendant's postconviction claims and examined the record to make any necessary amendments to the defendant's *pro se* successive petition. Zuber continued that, despite consultation with the defendant and review of the record, Zuber was "unable to make any amendments to the *pro se* [successive] petition that would be in compliance with the applicable law and allow Attorney Zuber to file a certificate pursuant to Illinois Supreme Court Rule 651(c)." Zuber, therefore, sought to withdraw as counsel.

21

¶ 43　When postconviction counsel decides that he or she must withdraw following the trial court's action of docketing a defendant's *pro se* petition for second stage proceedings, counsel must meet certain requirements. After the trial court has advanced the petition to the second stage, postconviction counsel's task is not to second guess the trial court's initial assessment of defendant's petition. *Kuehner*, 2015 IL 117695, ¶ 20. Rather, postconviction counsel is to move the process forward by "cleaning up" and presenting defendant's claims to the court for adjudication. *Id.* Our supreme court recognized, however, that postconviction counsel may discover "something that ethically would prohibit counsel from actually presenting the defendant's claims to the court." *Id.* ¶ 21. In this instance, postconviction counsel "bears the burden of demonstrating, with respect to each of the defendant's *pro se* claims, why the trial court's initial assessment was incorrect." *Id.*

¶ 44　The supreme court explained that, under these circumstances, a motion to withdraw is essentially a motion to reconsider. *Id.* "[A] motion to withdraw filed subsequent to a trial court's affirmative decision to advance the petition to the second stage does not ask the trial court to conduct its first-stage assessment a second time but rather seeks to bring to the trial court's attention information that was not apparent on the face of the *pro se* petition at the time such assessment was made." *Id.* When postconviction counsel files such a motion, counsel "owes the trial court at least some explanation as to why, despite its superficial virtue, the *pro se* petition is *in fact* frivolous or patently without merit, and counsel owes this explanation with respect to each of the defendant's *pro se* claims." (Emphasis in original.) *Id.* Therefore, the supreme court held:

22

"[W]here a *pro se* postconviction petition advances to the second stage on the basis of an affirmative judicial determination that the petition is neither frivolous nor patently without merit, appointed counsel's motion to withdraw must contain at least some explanation as to why all of the claims set forth in that petition are so lacking in legal and factual support as to compel his or her withdrawal from the case." *Id.* ¶ 27.

¶ 45 Here, Zuber's brief in support of his amended motion to withdraw offered an explanation as to why he concluded that he could not amend defendant's *pro se* successive petition. Zuber also stated that he had considered the factors required for an actual innocence claim. It is here that we note an important distinction between *Kuehner* and the present case. In *Kuehner*, the reasoning in postconviction counsel's motion to withdraw was not challenged, as defendant does in this appeal. Rather, the supreme court in *Kuehner* remanded the defendant's case for further second stage proceedings because postconviction counsel had failed to provide an explanation as to why one of defendant's several claims was frivolous or patently without merit. *Id.* ¶¶ 23-24. The supreme court acknowledged that an explanation as to why the defendant's claim was frivolous or patently without merit may exist but declined to make that case for counsel as a court of review. *Id.* ¶ 24. The circumstances here are different because Zuber provided an explanation in response to each of the defendant's claims, and Judge Schwartz did not allow Zuber to withdraw and dismiss the defendant's case until after "a review of the information."

¶ 46 Our analysis, therefore, does not stop at counsel's motion to withdraw, as the court did in *Kuehner*. Implicit in *Kuehner*'s holding "is a requirement that the postconviction

court must actually determine the petition is frivolous and patently without merit before allowing counsel to withdraw." *Johnson*, 2018 IL App (5th) 140486, ¶ 38. Where counsel's motion to withdraw provides an explanation as to each of the defendant's claims, as required by *Kuehner*, we must then evaluate counsel's explanations together with the merits of the defendant's contentions. If the record demonstrates that counsel complied with Rule 651(c) and the defendant's postconviction claims are without merit, we may uphold the trial court's ruling. *Greer*, 212 Ill. 2d at 211-12. We review both counsel's compliance with Rule 651(c) and the trial court's dismissal of a postconviction petition without an evidentiary hearing *de novo. People v. Moore*, 2018 IL App (2d) 170120, ¶ 34.

¶ 47 The defendant argues that we should remand for further second stage proceedings because his claims were not frivolous or patently without merit. A successive postconviction petition, however, must satisfy the requirements of cause and prejudice or actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. Claims of cause and prejudice and actual innocence are evaluated under a higher standard than the standard applicable to an initial petition, which only requires that the petition is not frivolous or patently without merit. *Id.* ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 35. Consequently, we review defendant's contentions on appeal under this higher standard and not whether his claims were frivolous or patently without merit.

¶ 48 The defendant first argues that Zuber could have amended defendant's *pro se* successive petition to make a claim of actual innocence supported by C.S.'s need for corrective eyewear, the contradiction in DNA testing, and the MySpace correspondence between the defendant's brother and the victim's daughter. A claim of actual innocence

24

requires evidence that is newly discovered, material and not cumulative, and of such a conclusive character that it would probably change the result on retrial. *Edwards*, 2012 IL 111711, ¶ 32. Newly discovered evidence is evidence that was discovered after trial and that could not have been discovered sooner through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. Evidence is material when it is relevant and probative to the defendant's innocence, and noncumulative when it adds to the evidence before the finder of fact at trial. *Id.* Finally, the conclusive character element refers to evidence that would probably lead to a different result when considered with the evidence presented at trial. *Id.* The new evidence need not be entirely dispositive to alter the result on retrial. *Id.* ¶ 97. Rather, the defendant must present evidence that places the evidence at trial in a different light and undermines the court's confidence in the judgment of guilt. *Id.* The conclusive character element is the most important element of an actual innocence claim. *Sanders*, 2016 IL 118123, ¶ 47.

¶ 49    The defendant asserts that C.S.'s need of corrective eyewear supports a claim of actual innocence. This claim was contained in defendant's *pro se* successive petition and supported by a letter from a private investigator indicating that C.S. is required to wear corrective lenses for driving. In the brief supporting his motion to withdraw, Zuber addressed this claim and noted that no cross-examination was conducted at trial concerning C.S.'s vision. Zuber added that whether C.S. wore corrective lenses or had any deficiencies that would have affected her ability to identify her attacker was unknown. Zuber also noted that Judge Watt heard the victim's testimony and found C.S. to be a credible witness. Zuber

25

concluded that C.S.'s need for corrective eyewear to drive would not be enough to sustain an actual innocence claim.

¶ 50 Our review of the defendant's claim and his supporting documentation leads this court to the same conclusion. Taking all of the defendant's assertions as true, his claim fails as a matter of law. First, this evidence is not "new." Identification was the predominant issue in the defendant's case. It stands to reason that evidence of any vision impairment that C.S. may have had at the time of her attack could have been discovered through the exercise of due diligence, or at least inquired into through cross-examination at trial. Furthermore, this evidence is not so conclusive that it would likely lead to a different result on retrial. As Zuber noted, Judge Watt had the opportunity to view the victim's testimony and found her credible. The evidence that C.S. is required to wear corrective lenses only serves to impeach her credibility, which is generally insufficient to warrant a new trial. See *People v. Holtzman*, 1 Ill. 2d 562, 568 (1953) ("Newly discovered evidence, the effect of which is to discredit, contradict and impeach a witness, does not afford a basis for the granting of a new trial."); see also *People v. Nolden*, 91 Ill. App. 3d 532, 542 (1980) (evidence that victim wore glasses for reading only served to possibly discredit the victim's identification testimony and did not afford a basis for granting a new trial). Thus, the evidence that C.S. is required to wear corrective eyewear for driving does not meet the standard for an actual innocence claim because it is neither new, nor so conclusive, that it would probably change result on retrial.

¶ 51 The defendant next argues that Zuber could have amended defendant's *pro se* successive petition to include a claim of actual innocence based upon the DNA testing

results from Orchid Cellmark and Dr. Reich's affidavit. In addressing this claim, Zuber offered an analysis as to why he believed the DNA testing results from Orchid Cellmark could not support a claim of actual innocence. Zuber also identified the specific factors required to make an actual innocence claim. Zuber observed that, while the Orchid Cellmark evidence would be considered new, the Orchid Cellmark report did not exclude the defendant as a contributor to either the epithelial or sperm fraction from the bed sheet. Zuber recognized that Dr. Reich's affidavit called for additional DNA testing that would establish whether DNA evidence implicated or excluded defendant. In analyzing this portion of the claim, Zuber observed that any DNA evidence, including evidence that specifically excluded the defendant, would still have to be weighed against the victim's identification of defendant at trial. Zuber concluded that the Orchid Cellmark report, which did not exclude the defendant, could not support a claim of actual innocence.

¶ 52    The record supports Zuber's contention. At trial, Judge Watt heard evidence that defendant's DNA profile could not be developed from the vaginal or rectal swabs tested by the Illinois State Police crime lab. Metzger, who performed the DNA testing, testified that he made no findings which eliminated defendant as a suspect. The posttrial Orchid Cellmark testing eliminated the defendant as a contributor to the partial Y-STR profile obtained from C.S.'s underwear. The defendant was not, however, eliminated from the partial Y-STR profiles obtained from the epithelial and sperm fractions on the bed sheet. Much like the DNA evidence at trial, the Orchid Cellmark findings neither specifically inculpate, nor exculpate, the defendant. Furthermore, Dr. Reich's affidavit does not assist the defendant, either. The affidavit only implies that more testing could be done to

positively identify, or exclude, the defendant. Thus, the Orchid Cellmark DNA testing results and Dr. Reich's affidavit do not place the trial evidence in a different light that undermines the court's confidence in the judgment of guilt.

¶ 53    Finally, the defendant claims that the alleged correspondence between the defendant's brother, Ray, and the victim's daughter, Gratias, evidenced on MySpace, is evidence of the defendant's actual innocence. According to the MySpace correspondence, Gratias allegedly stated that her mother's attacker used to watch Gratias and her sister play outside and lived "beside" their trailer. The defendant argues that Gratias implicated a neighbor, which supports the defendant's actual innocence claim. In Zuber's brief, he expressed his belief that the conversation could not be authenticated. He also called into question whether Gratias's statement would have been made based on personal knowledge, as opposed to hearsay. Zuber's explanation as to why he could not amend this claim does not address the required factors for an actual innocence claim. Nonetheless, as explained hereafter, the MySpace evidence does not meet the required standard for actual innocence.

¶ 54    Much like the defendant's claim regarding C.S.'s need of corrective lenses, the MySpace evidence is not new. The record shows that Gratias was known to defendant and his defense counsel, prior to trial. Attached to the defendant's supplemental postconviction petition, filed on April 17, 2017, was a purported police report from the Jackson County Sheriff's Department, dated November 13, 1993. This report stated that C.S. had a daughter, "Rachel," who was six years old and present in the home at the time of the attack. The record does not show that Rachel was ever interviewed by the defense or called as a witness to testify at trial. The record also does not show, nor does the defendant claim, that

28

Gratias was unavailable at the time of trial, or before trial. Any testimony relating to the identification of C.S.'s assailant by Gratias could have been discovered through the exercise of due diligence. Therefore, the purported MySpace correspondence does not satisfy the requirement of newly discovered evidence to support a claim of actual innocence.

¶ 55   Finally, the defendant contends that his *pro se* successive petition could have been amended to include a claim that residential burglary could not be the aggravating felony to support a conviction for aggravated criminal sexual assault. The defendant submits that the State failed to prove him guilty of aggravated criminal sexual assault because the State did not introduce evidence that any sexual assault occurred "during the course of" the perpetrator's entry into C.S.'s trailer.

¶ 56   In his *pro se* successive petition, the defendant argued that his convictions for aggravated criminal sexual assault were void and should be vacated. The defendant also argued that he could not be sentenced to an extended term on count III (aggravated criminal sexual assault) based on a residential burglary. Zuber addressed these claims and noted that this court had previously found the residential burglary was a "lesser included offense" for aggravated criminal sexual assault because the burglary was an "enhancing factor." Zuber also stated how residential burglary may serve as the aggravating felony for a charge of aggravated criminal sexual assault. In doing so, Zuber quoted the version of the residential burglary statute as it existed at the time of his amended motion to withdraw. See 720 ILCS 5/19-3(a) (West 2014) ("A person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the

29

dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft."). Zuber continued by stating that the sexual assaults occurred while the perpetrator remained within the dwelling and constituted a continuous act. Zuber also stated that the trial judge specifically found the defendant's actions were a single course of conduct.

¶ 57   Zuber's analysis is improper in that he evaluated the defendant's claim under the incorrect version of the residential burglary statute. As it existed at the time of the defendant's trial, the statute did not contain the language "remains within" the dwelling place of another. See 720 ILCS 5/19-3(a) (West 1992). As evidenced at the sentencing hearing, Judge Watt stated that he believed "[t]he residential burglary was completed shortly after the entry."

¶ 58   On appeal, the defendant criticizes Zuber's analysis and argues that an attorney providing reasonable representation would have amended defendant's *pro se* successive petition to allege that the State failed to prove defendant guilty of aggravated criminal sexual assault because the offenses did not occur "during the course of" the residential burglary. A defendant commits aggravated criminal sexual assault when the criminal sexual assault was perpetrated during the course of the commission or attempted commission of any other felony. See *id.* § 12-14(a)(4). The defendant asserts that the residential burglary was completed upon his entry into C.S.'s residence (see *People v. Maggette*, 195 Ill. 2d 336, 353 (2001)) and, therefore, could not serve as the aggravating felony for aggravated criminal sexual assault.

¶ 59   In making this argument, the defendant relies on our supreme court's decision in *People v. Giraud*, 2012 IL 113116. In *Giraud*, the defendant was charged with aggravated

criminal sexual assault. *Id.* ¶ 1. The charge was aggravated by the fact that the defendant knew he was HIV positive and had forcible intercourse with the victim without wearing a condom. *Id.* The supreme court reversed defendant's conviction for aggravated criminal sexual assault because the "mere" exposure to HIV during the commission of the sexual assaults did not threaten or endanger the victim's life. *Id.* ¶ 39. According to the court, the defendant would had to have communicated to the victim at the time of the assault that he was HIV positive. *Id.* ¶¶ 14-16. To endanger the victim's life, the victim would have had to actually be infected with HIV during the assault—the victim was never infected with HIV. *Id.* ¶¶ 33-35. The defendant argues *Giraud* limits aggravating circumstances to only those actions that occur "during the course of" the offense. Defendant's reliance on *Giraud* is misplaced.

¶ 60    To be considered an aggravating factor, the aggravating circumstance must occur at the time of the commission of the offense or so close to its occurrence that the defendant's actions are an inseparable part of the offense. *People v. Singleton*, 217 Ill. App. 3d 675, 687 (1991). The defendant argues that *Giraud* imposes a stricter reading for the phrase "during the course of" than *Singleton*. Under the defendant's interpretation, a defendant's actions that occur close in time to the aggravated offense could not be considered an aggravating factor. *Giraud* imposed no such reading of the statute. Rather, *Giraud* was concerned with the fact that no threat was ever communicated during the offense, and the victim's life was not in fact endangered during the offense. *Giraud*, 2012 IL 113116, ¶ 39. Therefore, we do not read *Giraud* as a limitation on *Singleton*'s pronouncement that an aggravating circumstance may be close in time to the aggravated offense.

31

¶ 61 The defendant's case is more akin to *People v. Colley*, 188 Ill. App. 3d 817, 820 (1989). In *Colley*, the defendant entered the victim's home at night and sexually assaulted her in a bedroom. *Id.* at 818. The defendant demanded money, and when the victim refused, the defendant struck the victim, threw her on the bed, and placed a pillow over her head. *Id.* The defendant then ordered the victim to go downstairs, where the defendant cut the victim with a knife. *Id.* at 818-19. On appeal, the defendant argued that the aggravating factor, cutting the victim with a knife, occurred "too long after the sexual acts were completed to be considered part of the same course of conduct." *Id.* at 819-20. The appellate court held that the aggravating circumstance, cutting the victim, was sufficiently close in time so that it may be considered to have been committed "during the course of" the sexual assault. *Id.* at 820.

¶ 62 Here, the defendant entered C.S.'s residence, ordered her into her bedroom, sexually assaulted her multiple times, told C.S. her boyfriend owed the defendant money, and stole money from a box on C.S.'s vanity. These actions occurred in a single course of conduct and were only interrupted when defendant went to the daughters' room to threaten them. Thus, the residential burglary was sufficiently close in time to the sexual assaults to be considered an aggravating factor. Although Zuber analyzed the defendant's contentions under the incorrect version of the statute, we find that *Singleton* and *Colley* support our finding that the residential burglary was sufficiently close in time to the sexual assaults to be considered an aggravating factor. Thus, remand for further second stage proceedings is not warranted, as the defendant's claim fails as a matter of law, and the defendant has not

shown that this claim can be brought under either the "cause and prejudice" or actual innocence exceptions to the statutory bar against successive petitions.

¶ 63    In summary, we find Zuber did not fail to provide reasonable assistance of counsel, and Judge Schwartz properly granted Zuber's amended motion to withdraw and dismissed the defendant's case. The record shows that Zuber consulted with the defendant and ascertained his contentions but determined he could not amend the defendant's petition. Zuber's amended motion to withdraw and brief in support offered a sufficient explanation as to why Zuber believed he could not amend the defendant's *pro se* successive petition. The record also demonstrates that the defendant's purported actual innocence claims and argument for vacating his aggravated criminal sexual assault convictions fail as a matter of law.

¶ 64    As an alternative remedy, the defendant asks this court to remand his case for a *Krankel*-like inquiry into whether Zuber provided unreasonable assistance of counsel. Following the submission of defendant's initial brief, however, the Illinois Supreme Court held that the posttrial motion procedure created in *Krankel* did not extend to allegations of unreasonable assistance by postconviction counsel. *People v. Custer*, 2019 IL 123339, ¶ 46. Accordingly, we deny the defendant's request for remand.

¶ 65    For the foregoing reasons, the trial court's order allowing Zuber to withdraw and dismissing defendant's *pro se* successive postconviction petition is affirmed.


¶ 66    Affirmed.